JEFFREY BLUMBERG
Email: Jeffrey.blumberg@cfpb.gov
Phone: 202-435-9687
REBECCA COLEMAN
Email: rebecca.coleman@cfpb.gov
Phone: (202) 435-7541
1700 G Street NW
Washington, DC 20552
Fax: (202) 435-7722

LEANNE HARTMANN, CA Bar # 264787 - Local Counsel
301 Howard St., Suite 1200
San Francisco, CA  94105
Email: leanne.hartmann@cfpb.gov
Phone: (415) 844-9787
Fax: (415) 844-9788

Attorneys for Plaintiff Bureau of Consumer Financial Protection

# IN THE UNITED STATES DISTRICT COURT
# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Bureau of Consumer Financial Protection,<br><br>*Plaintiff*,<br><br>v.<br><br>GST Factoring, Inc.; Champion Marketing Solutions, LLC; Rick Graff; Gregory Trimarche; Scott Freda; Amanda Johanson; David Mize; Jacob Slaughter; and Daniel Ruggiero;<br><br>*Defendants*. | Case No.<br><br>**COMPLAINT FOR INJUNCTIVE RELIEF, RESTITUTION, CIVIL MONEY PENALTIES AND DISGORGEMENT** |

## INTRODUCTION

1. The Bureau of Consumer Financial Protection (Bureau) brings this action against GST Factoring, Inc., Champion Marketing Solutions, LLC, Rick Graff, Gregory

**COMPLAINT**

Trimarche, Scott Freda, Amanda Johanson, David Mize, Jacob Slaughter, and Daniel Ruggiero (Defendants) alleging that Defendants are engaging in abusive telemarketing practices in violation of the Telemarketing and Consumer Fraud and Abuse Prevention Act (Telemarketing Act), 15 U.S.C. §§ 6101 et seq., and its implementing rule, the Telemarketing Sales Rule (TSR), 16 C.F.R. Part 310.

2.      Defendants are engaging in widespread violations of the TSR in their student-loan debt-relief operation (the Debt-Relief Operation), harming consumers nationwide by charging unlawful advance fees.  The Bureau brings this action to stop Defendants' unlawful conduct, obtain relief for harmed consumers, and impose civil money penalties on Defendants for their unlawful actions.

## JURISDICTION AND VENUE

3.      This Court has subject-matter jurisdiction over this action because it is brought under federal consumer financial law, 12 U.S.C. § 5565(a)(1), presents a federal question, 28 U.S.C. § 1331, and is brought by an agency of the United States, 28 U.S.C. § 1345.

4.      Venue is proper in this district pursuant to 12 U.S.C. § 5564(f) because Defendants are located, reside, or do business in this district.

## PARTIES

5.      The Bureau is an independent agency of the United States. 12 U.S.C. § 5491(a). The Bureau is charged with enforcing federal consumer financial laws. 12 U.S.C. §§ 5563 and 5564. The Bureau has independent litigating authority, 12 U.S.C. §§ 5564(a) and (b), including the authority to enforce the TSR with respect to the offering or provision of a consumer financial product or service subject to the Consumer Financial Protection Act (CFPA), 15 U.S.C. §§ 6102(c), 6105(d).

6.      Defendant GST Factoring, Inc. (GST) is a Delaware corporation doing business at 8551 Boat Club Rd., Suite 121, Fort Worth, Texas 76179.  GST manages the Debt-Relief Operation.  It has found and worked with lead generators to market the

business, including through telemarketing; recruited Johanson, Mize, Slaughter, and Ruggiero (collectively, the Attorneys) to provide the debt-relief services to consumers; and, through a factoring agreement with the Attorneys, taken all the fees paid by consumers and distributed them to the participants in the Debt-Relief Operation.

7.    Defendant Champion Marketing Solutions, LLC (CMS) is a Texas limited liability company doing business at 6302 Creekwood Ct., Sachse, Texas 75048.  CMS acts as the customer-service arm of the Debt-Relief Operation.  It has coordinated with and trained the lead generators, including by providing scripts; helped create and retain consumer records and make the monthly financial debits from consumers' accounts or troubleshoot issues with those debits; and acted as the liaison between consumers and the Attorneys.

8.    Defendant Rick Graff is a 33% shareholder of GST with substantial managerial responsibility for and control over its business practices in connection with the Debt-Relief Operation. Graff, who has significant experience in the debt-settlement industry, has handled, among other things, the marketing of the Debt-Relief Operation, including recruiting, training, and coordinating with the lead generators.  He has also handled the finances of the Debt-Relief Operation, including the collection of consumer fees.

9.    Defendant Gregory Trimarche is a 33% shareholder of GST with substantial managerial responsibility for and control over its business practices in connection with the Debt-Relief Operation. Trimarche, an attorney, has handled, among other things, drafting agreements, including the attorney-engagement agreement used to enroll consumers, and negotiating and drafting agreements among the parties to the Debt-Relief Operation, such as the factoring agreement and agreements with lead generators.  He has also handled recruiting the Attorneys, providing guidance to them, and monitoring their relationship with the lead generators.

10.    Defendant Scott Freda is the owner of CMS with substantial managerial responsibility for and control over its business practices in connection with the Debt-Relief Operation. Freda manages CMS's operations by, among other things, resolving

**COMPLAINT**

1  payment issues, coordinating with lead generators, developing content for the telephone

2  scripts used by CMS employees with consumers, and tracking cancellations.

3       11.    Defendant Amanda Johanson is an attorney based in Aliso Viejo, California,

4  who has conducted business as Johanson Law Group, Amanda Johanson & Associates,

5  and K&J Law Group.  Johanson has offered and provided financial advisory services to

6  assist consumers with debt settlement, including debt-relief services marketed through

7  telemarketing arrangements.  Johanson is currently on inactive status with the state bar

8  and suspended from the practice of law.

9       12.    Defendant David Mize is an attorney based in Phoenix, Arizona who does

10  business as David Mize Law, PLLC.  Mize has offered and provided financial advisory

11  services to assist consumers with debt settlement, including debt-relief services marketed

12  through telemarketing arrangements.

13       13.    Defendant Jacob Slaughter is an attorney based in Costa Mesa, California

14  who has done business as Slaughter LLP.  Slaughter has offered and provided financial

15  advisory services to assist consumers with debt settlement, including debt-relief services

16  marketed through telemarketing arrangements.

17       14.    Defendant Daniel Ruggiero is an attorney based in Delray Beach, Florida

18  who does business as The Law Offices of Daniel Ruggiero and Pinnacle Law Group.

19  Ruggiero has offered and provided financial advisory services to assist consumers with

20  debt settlement, including debt-relief services marketed through telemarketing

21  arrangements.

22

23                          **FACTUAL ALLEGATIONS**

24       15.    GST and CMS started the Debt-Relief Operation in 2015 under the

25  leadership of Graff, Trimarche, and Freda.  The Debt-Relief Operation uses telemarketing

26  to sell debt-relief services provided by the Attorneys to consumers with private student-

27  loan debt.  The services are sold as legal services, even though most of the fees paid by

28  consumers go to GST, CMS, and their lead generators, and in nearly all instances, the

1  service provided is debt-settlement negotiation, something that does not require legal
2  training.

3       16.    Lead generators, hired and directed by GST and trained by CMS, market the
4  services of the Debt-Relief Operation through telemarketing.  The lead generators send
5  consumers mail solicitations marketing debt-relief services for federal student loans with
6  a telephone number that connects to the lead generators' telephones. If consumers call
7  that telephone number and indicate that they have private student loans, the lead
8  generators encourage those consumers to sign up with an Attorney to obtain debt-relief
9  services.

10      17.    In the sales pitch, the lead generators follow a script that was drafted and
11 vetted by GST, CMS, or one of the Attorneys.  One such script, for example, instructs the
12 lead generators to encourage consumers to "get … UNDER THE PROTECTION of the
13 Law Firm," claiming that the consumer would have "a licensed attorney [who would]
14 zealously attack your debtholder to the full extent of the law" and use "any and all legal
15 tools available to attack your debt."  The lead generators encourage consumers to stop
16 paying their student-loan debt, claiming that being behind in payments will make lenders
17 more likely to agree to a settlement.

18      18.    As part of the sales pitch, the lead generators also tell consumers that they
19 are supposed to keep a log of their communications with the lenders as part of the
20 program, so that, according to one script, the lenders' "aggression and standard collection
21 practices can begin to work against them."  The lead generators suggest that the
22 Attorneys will use that information to establish that lenders are engaged in violations of
23 the Fair Debt Collection Practices Act (FDCPA) or the Telephone Consumer Protection
24 Act (TCPA), which can be used to reduce or eliminate the consumers' student-loan debts.

25      19.    If a consumer signs up, he or she electronically signs an attorney-
26 engagement agreement while on the phone with the lead generator. The parties to the
27 engagement agreement are the consumer and one of the Attorneys, either Johanson,
28 Mize, or Slaughter.  The engagement agreement contains no mention of the Debt-Relief
Operation, or the other participants in the Debt-Relief Operation.

5
COMPLAINT

1      20.    The attorney-engagement agreement provides that the scope of services is to
2  reduce or eliminate the consumer's student-loan debt "primarily through negotiation."
3  The agreement also provides for a fee, typically 40% of the outstanding debt, to be paid
4  by monthly installments, along with a processing fee that costs an additional $10 per
5  month.

6      21.    The monthly payment plan typically lasts between 24 and 84 months.  A
7  payment schedule attached to the engagement agreement provides the precise date the
8  payments begin, which is either upon enrollment or soon thereafter.

9      22.    After a consumer agrees to sign up, the consumer is either transferred by
10 phone to CMS or receives a follow-up "Welcome Call" from CMS within a day or two of
11 signing up.  In that call, a CMS employee reviews the engagement agreement, sets up the
12 consumer's automatic payment withdrawals, collects the necessary documents, and
13 informs the Attorney who is assigned to that consumer that the consumer has signed up
14 and the file is ready for review.

15     23.    The assigned Attorney, either Johanson, Mize, or Slaughter, would then
16 review and approve the consumer's engagement agreement and payment plan.

17     24.    Johanson, who was the first attorney recruited by GST to provide debt-relief
18 services, was associated with the business from about July 2015 through March 2018.
19 From July 2015 through some time in 2018, more than 1,000 consumers from across the
20 United States signed engagement agreements with Johanson through the process
21 described above.

22     25.    But Johanson did little to no work pursuant to these engagement agreements.
23 After several client complaints, the California Bar initiated an investigation into
24 Johanson's conduct and instituted disciplinary charges against her. Then, after Johanson
25 stipulated to inactive status, the proceedings against her were abated.  She is also
26 suspended from the practice of law for failure to pay the required fees.

27     26.    GST recruited Ruggiero to take over work on Johanson's client files, and in
28 February 2018, he began providing debt-relief services to about 160 consumers who had
engagement agreements with Johanson but had received little or no assistance from her.

**COMPLAINT**

27.     At the time or soon after he took on these consumers, Ruggiero knew, or was at least on notice, that the Johanson consumers were enrolled in the Debt-Relief Operation through lead generators that had made those sales through telemarketing. Moreover, with over ten years of experience in debt relief, Ruggiero was aware that lead generators marketing debt-relief services to consumers rely on telemarketing. Indeed, Ruggiero has set up a similar debt-relief company where lead generators used telemarketing to recruit consumers.

28.     Ruggiero also knew that GST was receiving fees before consumers' debts were settled because he was receiving payments from GST for consumers whose debts had not been settled. He was also aware of complaints against Johanson by consumers who said they had been paying and had not yet had their debts settled.

29.     Mize began taking clients in November 2015 through the process described above. Since that time, about 950 consumers from throughout the United States have signed engagement agreements with him.

30.     Slaughter began taking clients in April 2017 through the process described above. Since that time, about 600 consumers from throughout the United States have signed engagement agreements with him.

31.     On or about December 17, 2019, Slaughter transferred his law firm, including his obligations to provide debt-relief services for consumers in connection with the Debt-Relief Operation, to Ruggiero. Ruggiero knew at the time he agreed to take over Slaughter's firm that the consumers for whom the firm was providing services were solicited by the Debt-Relief Operation. When Ruggiero took over providing debt-relief services for these consumers, he was on notice that the Debt-Relief Operation had used telemarketing to solicit those consumers and that they were being charged fees before their debts were settled.

32.     The Debt-Relief Operation's sales pitch makes it seem as if consumers are simply hiring an attorney to help them who will use "any and all legal tools available to attack [their] debt." But, in reality, to the extent they provide debt-relief services to consumers, the Attorneys provide almost exclusively negotiation and settlement services.

**COMPLAINT**

The Attorneys referred all, or nearly all, litigation matters relating to the debt-relief services to other lawyers outside the Debt-Relief Operation, including debt collection lawsuits filed against consumers who stopped making payments on their private student loans on the advice of the lead generators, CMS, or the Attorneys themselves.

33.     In addition, although the lead generators told consumers to keep logs about communications from their lenders that the Attorneys could rely on to prove violations of the FDCPA or the TCPA, they were rarely used.  In a few instances, the Attorneys referred the consumers to other lawyers to bring TCPA claims, but in nearly all instances, no legal action was taken based on these logs.

34.     Also, while the attorney-engagement agreements make it seem as if the fees are being paid only to the Attorney, all the fees paid by consumers actually go to GST. The terms of each attorney-engagement agreement provide that the fees, which are payable to the Attorney who signs the agreement, may be transferred to another party. All of the Attorneys in the Debt-Relief Operation transfer the receivables from the engagement agreements to GST.

35.     GST distributes portions of those fees to each participant in the Debt-Relief Operation.  On a monthly basis, GST gives each Attorney approximately 10-20% of the payments from the consumers assigned to them, CMS approximately 10% of all the payments received, and the lead generators approximately 30-40% of the payments from the consumers they referred to the Debt-Relief Operation. GST retains approximately 40% of the monthly consumer payments.

36.     Graff, Trimarche, and Freda each participated in or had the authority to control the request or receipt of the fees under the attorney-engagement agreements, and the telemarketing of the debt-relief services by the Debt-Relief Operation.  Graff worked with the lead generators and facilitated all of the monthly payments. Trimarche drafted and negotiated the agreements with the lead generators, drafted the attorney-engagement agreements that set forth the fees, and drafted the factoring agreement with the Attorneys that provided for the transfer of the fees to GST.  Freda worked with the lead generators

**COMPLAINT**

1  to resolve payment and database issues, and updated them on CMS's work.  He also

2  drafted scripts for welcome calls and helped track consumer cancellations.

3  37.   Graff, Trimarche, Freda, and the Attorneys knew or were recklessly

4  indifferent to the fact that consumers were being charged and were paying fees for debt-

5  relief services prior to debt settlement and that the Debt-Relief Operation was marketing

6  those debt-relief services through telemarketing.

7  38.   Under the engagement agreements described above, GST, on behalf of the

8  Debt-Relief Operation, had received about $11.8 million in fees from approximately

9  2,600 consumers as of May 2020.

10  39.   After paying the other Defendants and the lead generators, as of November

11  2019, GST had retained more than $4.5 million in fees.  Of this amount, Graff took more

12  than $1.6 million and Trimarche took more than $1.5 million.

13  40.   As of May 2020, CMS's distribution of fees from the Debt-Relief Operation

14  amounted to approximately $1 million.

15  41.   As of May 2020, Johanson's distribution of fees from the Debt-Relief

16  Operation amounted to approximately $520,000.

17  42.   As of May 2020, Ruggiero's distribution of fees from the Debt-Relief

18  Operation amounted to approximately $125,000.

19  43.   As of May 2020, Mize's distribution of fees from the Debt-Relief Operation

20  amounted to approximately $573,000.

21  44.   As of May 2020, Slaughter's distribution of fees from the Debt-Relief

22  Operation amounted to approximately $240,000.

23  **DEFENDANTS' VIOLATIONS OF THE TSR**

24  45.   The Bureau is authorized to enforce the Telemarketing Act and the TSR

25  with respect to the offering or provision of a consumer financial product or service

26  subject to the CFPA. 15 U.S.C. § 6105(d).  Among other things, a consumer financial

27  product or service is defined by the CFPA to include "providing financial advisory

28  services…including…providing services to assist a consumer with debt management or

**COMPLAINT**

1  debt settlement [or] modifying the terms of any extension of credit….”  12 U.S.C.

2  § 5481(15)(viii)(II).

3    46.    The TSR defines “debt relief service” as “any program or service

4  represented, directly or by implication, to renegotiate, settle, or in any way alter the terms

5  of payment or other terms of the debt between a person and one or more unsecured

6  creditors or debt collectors, including, but not limited to, a reduction in the balance,

7  interest rate, or fees owed by a person to an unsecured creditor or debt collector.” 16

8  C.F.R. § 310.2(o).

9    47.    The TSR defines a “seller” as “any person who, in connection with a

10  telemarketing transaction, provides, offers to provide, or arranges for others to provide

11  goods or services to the customer in exchange for consideration.” 16 C.F.R. § 310.2(dd).

12    48.    The TSR defines “telemarketer” as “any person who, in connection with

13  telemarketing, initiates or receives telephone calls to or from a customer.” 16 C.F.R.

14  § 310.2(ff).

15    49.    The TSR defines “telemarketing” in relevant part as “a plan, program, or

16  campaign which is conducted to induce the purchase of goods or services . . . by use of

17  one or more telephones and which involves more than one interstate telephone call.” 16

18  C.F.R. § 310.2(gg).

19    50.    The lead generators hired by GST and trained by CMS to market the

20  student-loan debt-relief services offered by the Debt-Relief Operation have engaged in

21  telemarketing under the TSR by implementing a plan, program or campaign conducted to

22  induce the purchase of those services by using one or more telephones and which

23  involved more than one interstate call.  CMS has participated in this plan, program or

24  campaign by using one or more telephones and more than one interstate call to complete

25  this process.

26    51.    The services offered and provided by the Attorneys on behalf of the Debt-

27  Relief Operation, marketed by the lead generators hired by GST, and finalized over the

28  telephone by CMS, are debt-relief services under the TSR because they are services

represented, directly or by implication, to renegotiate, settle, or alter the terms of payment

**COMPLAINT**

or other terms of consumers' private student loans.  They are also consumer financial services subject to the CFPA because they are services to assist a consumer with debt management or debt settlement or modifying the terms of an extension of credit.

52.     GST is a seller under the TSR because it has arranged for the Attorneys, in connection with telemarketing transactions by its lead generators and CMS, to provide debt-relief services in exchange for consideration.

53.     CMS is a seller under the TSR because it has arranged for the Attorneys, in connection with the telemarketing transactions by it and the lead generators, to provide debt-relief services in exchange for consideration.  CMS is also a telemarketer under the TSR because by providing customer service to consumers of the Debt-Relief Operation and completing the enrollment process the lead generators began over the phone, it has initiated or received phone calls to or from consumers in connection with telemarketing.

54.     Johanson, Mize, and Slaughter are sellers under the TSR because, pursuant to the engagement agreements, they have offered and provided debt-relief services in exchange for consideration in connection with the telemarketing transactions undertaken by the lead generators and CMS.

## COUNT I

### Request and Receipt of Advance Fees for Debt-Relief Services in Violation of the TSR
### (GST, CMS, Rick Graff, Gregory Trimarche, Scott Freda, Amanda Johanson, David Mize, and Jacob Slaughter)

55.     The Bureau re-alleges and incorporates by reference Paragraphs 3 to 26, and 29 to 54.

56.     It is an abusive telemarketing act or practice in violation of the TSR for any seller or telemarketer to request or receive payment of any fee or consideration for debt-relief services unless and until: (A) the seller or telemarketer has renegotiated, settled, reduced, or otherwise altered the terms of at least one debt pursuant to a settlement agreement, debt-management plan, or other such valid contractual agreement executed by the customer; and (B) the customer has made at least one payment pursuant to that

settlement agreement, debt management plan, or other valid contractual agreement between the customer and the creditor or debt collector. 16 C.F.R. § 310.4(a)(5)(i)(A)-(B).

57.     Johanson, Mize, Slaughter, GST and CMS are telemarketers or sellers that have provided, offered to provide, or arranged for others to provide debt-relief services.

58.     In the course of providing, offering to provide, or arranging for others to provide debt-relief services, Johanson, Mize, and Slaughter have requested and received the payment of fees from consumers with whom they had engagement agreements for debt-relief services before renegotiating, settling, reducing, or otherwise altering the terms of at least one of each such consumer's debts, and before such consumer had made at least one payment on such altered debts, in violation of the TSR. 16 C.F.R. § 310.4(a)(5)(i)(A)-(B).

59.     In the course of providing, offering to provide, or arranging for others to provide debt-relief services, GST and CMS have requested and received the payment of fees from consumers with whom an Attorney had an engagement agreement for debt-relief services before the Attorney renegotiated, settled, reduced, or otherwise altered the terms of at least one of each such consumer's debts, and before such consumer had made at least one payment on such altered debts, in violation of the TSR. 16 C.F.R. § 310.4(a)(5)(i)(A)-(B).

60.     Graff, Trimarche, and Freda participated in or had the authority to control the requesting or receiving of fees from consumers prior to debt settlement, and the telemarketing of the debt-relief services by the Debt-Relief Operation.  Graff, Trimarche, and Freda knew or were recklessly indifferent to the fact that fees were requested and received from consumers prior to debt settlement, and that the debt-relief services were telemarketed by the Debt-Relief Operation.

61.     Therefore, GST, CMS, Graff, Trimarche, Freda, Johanson, Mize, and Slaughter have engaged in abusive telemarketing acts or practices in violation of 16 C.F.R. § 310.4(a)(5).

**COMPLAINT**

## COUNT II

**Providing Substantial Assistance or Support to Johanson, Mize, and Slaughter
in Their Violations of the TSR
(GST, CMS, Rick Graff, Gregory Trimarche, Scott Freda)**

62.     The Bureau re-alleges and incorporates by reference Paragraphs 3 to 26, and 29 to 54.

63.     The TSR prohibits any person from providing substantial assistance or support to any seller or telemarketer when that person knows or consciously avoids knowing that the seller or telemarketer is engaged in any act or practice that constitutes abusive conduct under the TSR. 16 C.F.R. § 310.3(b).

64.     Johanson, Mize, and Slaughter, in the course of providing, offering to provide, or arranging for others provide debt-relief services, have requested and received the payment of fees from consumers before the terms of at least one of each such consumer's debts was renegotiated, settled, reduced, or otherwise altered, and before such consumer had made at least one payment on such altered debts.  Thus, Johanson, Mize, and Slaughter have engaged in acts or practices that violated the TSR. 16 C.F.R. § 310.4(a)(5)(i)(A)-(B).

65.     GST, Graff, and Trimarche have provided substantial assistance or support to Johanson, Mize, and Slaughter by, among other things, developing the Debt-Relief Operation, facilitating the telemarketing, and facilitating the collection and distribution of advance fees paid by consumers.

66.     CMS and Freda have provided substantial assistance or support to Johanson, Mize, and Slaughter by, among other things, participating in the telemarketing of the debt-relief services, providing customer-service support for the Attorneys, and facilitating payments by consumers by setting up payment arrangements and troubleshooting payment issues.

67.     GST, CMS, Graff, Trimarche, and Freda knew, or consciously avoided knowing, that the debt-relief services provided by Johanson, Mize, and Slaughter were in connection with telemarketing.

**COMPLAINT**

68.     GST, CMS, Graff, Trimarche, and Freda knew, or consciously avoided knowing, that Johanson, Mize, and Slaughter requested or received fees from consumers before the terms of those consumers' debts were renegotiated, settled, reduced, or otherwise altered, and before those consumers had made at least one payment on such altered debts.

69.     Therefore, GST, CMS, Graff, Trimarche, and Freda have violated 16 C.F.R. § 310.3(b).

## COUNT III

### Providing Substantial Assistance or Support to GST and CMS
### in Their Violations of the TSR
### (Daniel Ruggiero)

70.     The Bureau re-alleges and incorporates by reference Paragraphs 3 to 54.

71.     The TSR prohibits any person from providing substantial assistance or support to any seller or telemarketer when that person knows or consciously avoids knowing that the seller or telemarketer is engaged in any act or practice that constitutes deceptive or abusive conduct under the TSR. 16 C.F.R. § 310.3(b).

72.     GST and CMS are telemarketers or sellers that on behalf of the Debt-Relief Operation have provided, offered to provide, or arranged for others to provide debt-relief services.

73.     In the course of providing, offering to provide, or arranging for others to provide debt-relief services pursuant to the engagement agreements telemarketed by lead generators hired by GST and telemarketed by CMS, GST and CMS have requested and received the payment of fees from consumers before the terms of at least one of each such consumer's debts was renegotiated, settled, reduced, or otherwise altered, and before such consumer had made at least one payment on such altered debts.  Thus, GST and CMS have engaged in acts or practices that violated the TSR. 16 C.F.R. § 310.4(a)(5)(i)(A)-(B).

74.     Ruggiero has provided substantial assistance or support to GST and CMS by providing debt-relief services for consumers who signed engagement agreements with

1    Johanson and Slaughter, but who were subsequently transferred to Ruggiero, thereby

2    enabling GST and CMS to continue to receive advance fees from those consumers.

3        75.    Ruggiero knew, or consciously avoided knowing, that the debt-relief

4    services arranged for by GST and CMS were in connection with telemarketing.

5        76.    Ruggiero knew, or consciously avoided knowing, that the fees obtained by

6    GST and CMS were requested or received from consumers before the terms of those

7    consumers' debts were renegotiated, settled, reduced, or otherwise altered, and before

8    those consumers had made at least one payment on such altered debts.

9        77.    Therefore, Ruggiero has violated 16 C.F.R. § 310.3(b).

10                          **DEMAND FOR RELIEF**

11   WHEREFORE, the Bureau requests, under 12 U.S.C. § 5565, that the Court:

12       a.    Impose appropriate injunctive relief against Defendants for their

13   violations of the TSR;

14       b.    grant additional injunctive relief as the Court may deem to be just and

15   proper;

16       c.    award monetary relief against Defendants including but not limited to

17   rescission or reformation of contracts, the refund of monies paid, restitution,

18   disgorgement or compensation for unjust enrichment, and payment of damages;

19       d.    award the Bureau civil money penalties;

20       e.    award the Bureau the costs of bringing this action; and

21       f.    award such other and additional relief as the Court may determine to

22   be just and proper.

23

24

25

26

27

28

**COMPLAINT**

1

2 Dated: July 13, 2020

3                                        Respectfully submitted,

4                                        THOMAS G. WARD
5                                        *Enforcement Director*

6                                        DAVID RUBENSTEIN
                                         *Deputy Enforcement Director*
7
                                         CYNTHIA LESSER
8                                        *Assistant Deputy Enforcement Director*

9

10

11                                       /s/ Leanne E. Hartmann
                                         Leanne E. Hartmann
12                                       Jeffrey Blumberg (pro hac pending)
13                                       Rebecca Coleman (pro hac pending)
                                         *Senior Litigation Counsel*
14                                       Bureau of Consumer Financial Protection
15                                       1700 G Street, NW
                                         Washington, DC 20552
16                                       Telephone: (202) 435-9687
17                                       Jeffrey.Blumberg@cfpb.gov
                                         Rebecca.Coleman@cfpb.gov
18
19                                       *Attorneys for Plaintiff Bureau of Consumer*
                                         *Financial Protection*
20

21

22

23

24

25

26

27

28

**COMPLAINT**